IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MYLAN PHARMACEUTICALS INC.,

        Plaintiff,

v.                    //   CIVIL ACTION NO. 1:06CV30
                              (Judge Keeley)

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE WORKERS
INTERNATIONAL UNION, LOCAL 8-957,

        Defendant.
and

MYLAN PHARMACEUTICALS INC.,

        Plaintiff,

v.                    //   CIVIL ACTION NO. 1:05CV35
                              (Judge Keeley)

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE WORKERS
INTERNATIONAL UNION, LOCAL 8-957,

        Defendant.


<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are the parties' cross motions for summary judgment in each of the above captioned cases. [1]  The plaintiff, Mylan Pharmaceuticals ("Mylan"), is a pharmaceutical company that develops, manufactures and distributes a variety of generic prescription drugs.  The defendant, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and

---

[1] By its June 23, 2006 Order, the Court consolidated these cases for the purposes of discovery and subsequent hearings because "both cases involve similar factual scenarios and the same questions of law." (1:06CV30, Doc. No. 27).

<u>__MEMORANDUM OPINION AND ORDER__</u>

Service Workers International Union, Local 8-957 (the "Union"), is the exclusive bargaining agent for approximately 730 production and maintenance employees working at Mylan's Morgantown, West Virginia facility.

In these cases, Mylan seeks the vacation of two arbitration awards each authorizing the reinstatement of grievant and bargaining unit member Irma Brooks ("Brooks"), after Mylan twice terminated her employment for acts of misconduct. By contrast, the Union seeks to enforce the awards and their respective findings that Mylan did not have "just cause" to terminate Brooks. For the reasons that follow, the Court **DENIES** Mylan's motions for summary judgment, **GRANTS** the Union's motions for summary judgment, and **UPHOLDS** Arbitrator Rimmel's and Arbitrator Zobrak's awards, respectively.

## I. <u>Background</u>

Sometime in July, 2002, Mylan employed Brooks as a Slat Counter Operator. In her position, Brooks was responsible for setting up and operating slat counter machines that fill empty bottles with manufactured pharmaceutical tablets and capsules as they progress down the packaging line. One of Brooks' essential job functions as a Slat Counter Operator was to "[p]erform[] job functions in accordance with current Good Manufacturing Practice

<u>MEMORANDUM OPINION AND ORDER</u>

regulations, Mylan's Standard Operating Procedures, and OSHA safety requirements." (R-143).[2]

Sometime during her January 7, 2004 shift, Brooks stopped the packaging line, placed three pieces of gum into an empty prescription pill bottle, and restarted the line. According to Brooks, she intended to share the gum with a coworker who was positioned further down the packaging line. When Brooks realized that her coworker had not retrieved the bottle containing the gum, she again stopped the line and asked her coworkers to help her locate the then sealed and packaged bottle. After approximately 10 to 20 minutes, the bottle containing the gum was found and discarded and production resumed.

After conducting an investigation of the incident, on January 14, 2004, Mylan terminated Brooks' employment for the above misconduct. In its notice of termination, Mylan informed Brooks that her "actions interfered [sic] and adversely affected the Company's efficient operation of its business." (1:05CV35, R-140). Thereafter, pursuant to the terms of the parties' collective bargaining agreement ("CBA"), the Union filed a grievance with Mylan for Brooks' "improper discharge."

---

[2] All citations to the Administrative Record and the record of this Court will refer to Civil Action # 1:06CV30 unless otherwise noted.

<u>MEMORANDUM OPINION AND ORDER</u>

On August 6, 2004, an arbitration hearing on the grievance was held before Arbitrator Rimmel, FMCS case # 040303-04190-A.  During the hearing, Brooks testified that, prior to the January 7, 2004 incident, she had also placed a piece of candy in a bottle on the packaging line and written a message on a bottle on the packaging line.  According to Brooks, both of those instances took place during one shift soon after she was employed, and in both instances the coworker for whom the candy and message were intended removed the bottles from the line as they came by.

On December 3, 2004, Arbitrator Rimmel issued a written opinion reducing Brooks' termination to a 10-day suspension and required Mylan to reinstate Brooks with back pay.  In making his decision, Arbitrator Rimmel first outlined the contractual (CBA) provisions he found relevant to the issue of whether Mylan had "just cause" to terminate Brooks.  He also examined relevant portions of Mylan's Code of Conduct, promulgated pursuant to authority reserved to Mylan in the CBA, including the four levels of offenses outlined in the Code.  Pursuant to the Code's terms, termination is warranted only when a first-time offense is at a Level IV.

In his decision, Arbitrator Rimmel found that Brooks' offense did not constitute a Level IV offense.  Instead, he found that the

<u>MEMORANDUM OPINION AND ORDER</u>

Code's Level III standard "concisely covers grievant's violative conduct on 7 January 2004." (1:05CV35, R-235). The Arbitrator then directed Mylan to reinstate Brooks after she served a ten day suspension from work, the most stringent disciplinary measure applicable for the first-time commission of a Level 3 offense. Notably, Arbitrator Rimmel did not address Brooks' prior acts of placing a piece of candy in a bottle and writing on a bottle, to which she admitted during the arbitration hearing, because "the limited record before [him] simply [did] not allow for final adjudication of the matter." (R-237).

Prior to her ordered reinstatement, on December 10, 2004, Mylan again terminated Brooks, effective August 6, 2004, the date on which it had learned of her earlier misconduct. Again, the Union filed a grievance challenging this second termination as an improper discharge. Like the first grievance, the Union's second grievance regarding Brooks proceeded to arbitration under the terms of the CBA.

On August 19, 2005, an arbitration hearing was held on the grievance before Arbitrator Zobrak**,** FMCS case # 050210-53204. Thereafter, on November 21, 2005, Arbitrator **Zobrak** issued his decision, which emphasized the fact that the acts underlying the

arbitration dispute before him had occurred prior in time to any acts involved in the proceedings before Arbitrator Rimmel. As such, he characterized Brooks' acts of placing a piece of candy in a bottle and writing a message on a bottle on the production line as a first-time offense.

As did Arbitrator Rimmel, Arbitrator Zobrak looked to Mylan's Code of Conduct in evaluating whether Mylan had "just cause" under the CBA to terminate Brooks. He also heard the testimony of several witnesses, including experts on FDA regulation and policy, and found that Brooks' acts constituted multiple violations of Mylan's Standard Operating Procedures ("SOPs") and various Good Management Practices ("GMPs") promulgated by the United States Food and Drug Administration ("FDA"). He further found, however, that "[n]one of the Group IV rules mentions violations of SOPs or GMPs or specifically addresses any of the conduct engaged in by the Grievant." (Doc. 9, Ex. A at 10). Rather, Arbitrator Zobrak concluded, the failure to follow SOPs and GMPs is designated in the Code of Conduct as a Level II offense, for which a first-time offender is subject to a final written warning. Thus, Arbitrator Zobrak directed Mylan to reinstate Brooks' and reduced her termination to a final written warning.

## II. Relevant Procedural History

<u>MEMORANDUM OPINION AND ORDER</u>

On February 24, 2005, Mylan filed its complaint in Civil Action # 1:05CV35, seeking to vacate Arbitrator Rimmel's award. Similarly, on February 16, 2006, Mylan filed its complaint in Civil Action # 1:06CV30, seeking to vacate Arbitrator Zobrak's award. The Union filed counterclaims to both complaints seeking enforcement of the respective awards.

In each case, the parties have filed cross motions for summary judgment that are fully briefed and have been argued to the Court. In both cases, Mylan challenges the Arbitrators' respective awards as violations of public policy, and also asserts that the awards fail to draw their essence from the CBA, reflecting, instead, the arbitrators' own notions of industrial justice. The Union disagrees and argues that the Arbitrators' written awards should be enforced because, pursuant to Section 6.6 of the CBA, "[t]he award of the arbitrator . . . shall be final and binding on both parties." (Doc. No. 7 at 8.)

### III. <u>Standards of Review</u>

**a. Summary Judgment**

A motion for summary judgment should be granted when the record reveals that there is "no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).

Here, Brooks' acts, the terms of the CBA, the terms of Mylan's Code of Conduct, and the Arbitrators' decisions are all clearly set forth on the record.  Neither party asserts the existence of a genuine issue of material fact, and the Court finds none. Accordingly, in deciding the motions before it, the Court must determine as a matter of law whether to vacate or enforce Arbitrator Rimmel's and Arbitrator Zorback's respective awards.

## b. Review of Arbitration Awards

"Judicial review of an arbitration award has been characterized as 'among the narrowest known to the law.'" <u>Westvaco Corporation v. United Paperworkers International Union, AFL-CIO</u>, 171 F.3d 971, 974 (4th Cir. 1999)(quoting <u>Union Pac. R.R. v. Sheehan</u>, 439 U.S. 89, 91 (1978)).  "Absent the most unusual of circumstances, courts must uphold and enforce arbitral awards." <u>Id.</u> This is so because "arbitration must be final to be effective." <u>Id.</u>

By granting an arbitrator binding authority to interpret the terms of their contract, parties "bargain[] for" the "arbitrator's construction" of that contract. <u>Eastern Associated Coal Corporation v. United Mine Workers of America, District 17, et. al.</u>, 531 U.S.

57, 61-62 (2000)(citing <u>United Steelworkers of America v.</u>
<u>Enterprise Wheel & Car Corp.</u>, 363 U.S. 593, 599 (1960)).
Accordingly, courts must give such construction "full play" to
ensure that long-standing labor policy is effectuated. <u>See</u> <u>United</u>
<u>Steelworkers of America v. American Manufacturing Co.</u>, 363 U.S.
564, 566 (1960)(discussing Section 203(d) of the Labor Management
Relations Act, 1947). Thus, when parties have agreed to submit
questions of contract interpretation to an arbitrator and a
grievance under that contract is filed, "courts . . . have no
business weighing the merits of the grievance, considering whether
there is equity in a particular claim, or determining whether there
is particular language in the written instrument which will support
the claim." <u>Id.</u> at 568. Rather, "'as long as [an honest]
arbitrator is even arguably construing or applying the contract and
acting within the scope of his authority,' the fact that 'a court
is convinced he committed serious error does not suffice to
overturn his decision.'" <u>Eastern</u>, 531 U.S. at 61-62 (quoting
<u>Paperworkers v. Misco, Inc.</u>, 484 U.S. 29, 38 (1987).

Despite the narrow lens through which courts review
arbitration awards, those awards "may be overturned if the award
violates well-settled and prevailing public policy, fails to draw
its essence from the collective bargaining agreement or reflects

the arbitrator's own notions of right and wrong." <u>Mountaineer Gas
Company v. Oil, Chemical & Atomic Workers International Union</u>, 76
F.3d 606, 608 (4th Cir. 1996)(citing <u>Misco</u>, 484 U.S. at 36).  In
these consolidated cases, Mylan argues that the arbitration awards
authorizing Brooks' reinstatement violate such public policy, or,
in the alternative, that the awards fail to draw their essence from
the parties' CBA and thus improperly reflect Arbitrator Rimmel's
and Arbitrator Zobrak's personal notions of right and wrong.

## IV. <u>Discussion</u>

### a. Awards Do Not Violate Clearly-Defined Public Policy

In order for public policy to preclude the enforcement of a
collective bargaining agreement as interpreted by an arbitrator,
that policy "must be well defined and dominant, and is to be
ascertained 'by reference to the laws and legal precedents and not
from general considerations of supposed public interests.'" <u>W.R.
Grace and Company v. Local Union 759, Int. Union of the United
Rubber, Cork, Linoleum and Plastic Workers of America</u>, 461 U.S.
757, 766 (1983) (quoting <u>Muschany v. United States</u>, 324 U.S. 49, 66
(1945)). Nevertheless, a court's "authority to invoke the public
policy exception is not limited solely to instances where the
arbitration award itself violates positive law." <u>Eastern</u>, 531 U.S.

at 63. However, "where two political branches have created a
detailed regulatory regime in a specific field, courts should
approach with particular caution pleas to divine further public
policy in that area." Id.

The detailed regulatory regime at issue in these cases was
created by Congress through its passage of the Food, Drug and
Cosmetic Act, 21 U.S.C. §§ 301, et. seq. ("FDCA"), and the
regulations subsequently promulgated by the FDA. Here, both
parties recognize that, pursuant to 21 U.S.C. § 331(a), the FDCA
prohibits "[t]he introduction or delivery for introduction into
interstate commerce of any food, drug, device, or cosmetic that is
adulterated or misbranded." Further, the regulations promulgated
by the FDA under the FDCA set forth the minimum GMPs for "methods
to be used in, and the facilities or controls to be used for, the
manufacture, processing, packing, or holding of a drug" to assure
that it meets the safety and purity requirements of the FDCA. 21
C.F.R. § 210.1(a). Moreover, the failure of a person to comply
with those GMPs in the manufacturing, processing, packing, or
holding of a drug shall render that drug "adulterated" and subject
the person to regulatory action. 21 C.F.R. § 210.1(b).

Given this regulatory framework, Mylan contends that Brooks'
actions have subjected Mylan to the specter of regulatory action by

-11-

the FDA, and that the arbitration awards authorizing her reinstatement violate the clearly-defined public policy against the introduction of adulterated drugs into interstate commerce. While recognizing that Brooks' actions of placing foreign objects into, and writing on, prescription drug bottles "may result in a technical violation of the Act," (doc. no. 33 at 5), the Union emphasizes that the issue before the Court is not whether Brooks' acts violated public policy, but whether the respective arbitration awards authorizing Brooks' reinstatement while imposing disciplinary sanctions less severe than termination under the CBA violate any well-defined and dominant public policy. See Eastern, 531 U.S. at 62-63 (clarifying that the court must determine whether an agreement authorizing relief as interpreted by an arbitrator violates dominant and well-defined public policy, not whether the grievant's actions violate that policy).

In these cases, both Arbitrator Rimmel and Arbitrator Zobrak found that Mylan had terminated Brooks without just cause under the CBA. Accordingly, in their respective awards, each authorized Brooks' reinstatement to work after the imposition of some lesser disciplinary sanction deemed appropriate pursuant to Mylan's Code of Conduct, which was promulgated under the CBA. Thus, the question before the Court is whether dominant and well-defined

public  policy   is  violated  by  a  CBA,  as  interpreted  by  an
arbitrator   with   jurisdiction   to   do   so,   which   authorizes
disciplinary action less severe than the termination of an employee
who places foreign objects into, and writes on, prescription drug
bottles.

While the FDCA and its regulations clearly outline what the
current GMPs in the pharmaceutical industry are, and that
regulatory sanctions shall apply to those who violate them, they
are silent with regard to what those sanctions may or should be.[3]
Indeed, when testifying on the issue before Arbitrator Zobrak in
Brooks' second arbitration proceeding, Mylan's expert, Paul Vogel,
a former senior FDA director, stated that "[t]here is no specific
provision that requires the employer to do any particular action
other than what it deems to be the appropriate corrective action."
(R-94).

In a later hearing before this Court, Mr. Vogel went on to
testify that, under the FDCA, the FDA regulates policies and

---

[3] 21 C.F.R. §§ 211.25 and 211.28 are the only regulations promulgated by
the FDA that address personnel qualifications and responsibilities in relation
to current GMPs for finished pharmaceuticals.  While § 211.25 requires that
"[e]ach person engaged in the manufacture, processing, packing, or holding of
a drug product shall have education, training, and experience . . . to enable
that person to perform the assigned functions," neither regulation addresses
what action, if any, is appropriate when a person fails to properly perform
those functions.

<u>MEMORANDUM OPINION AND ORDER</u>

procedures of the pharmaceutical industry to ensure that personnel involved in the manufacture and packaging of prescription drugs are qualified and trained in both current GMPs and SOPs. He opined that Brooks' conduct of placing a piece of candy in a prescription drug bottle, placing three pieces of gum in a prescription drug bottle, and writing on the exterior of a prescription drug bottle were not in conformance with a number of those current standards. Moreover, he testified that the FDA has a zero tolerance policy for the intentional introduction of foreign matter into pharmaceutical products, and that Mylan could have been subject to significant regulatory action for Brooks' misconduct. Finally, however, although he believed the FDA would be "very suspicious" if a person who had engaged in such conduct had not been terminated, he reiterated that there is nothing in the regulations outlining what the appropriate disciplinary action for such conduct may or should be. Rather, he acknowledged that the determination is left to the employer and the FDA evaluators during inspection.

In these cases, both Arbitrator Rimmel and Arbitrator Zobrak looked to the CBA and the Code of Conduct promulgated by Mylan under that CBA to determine whether termination was the appropriate disciplinary action. In each case, the Arbitrators determined that it was not, instead finding that the parties' contractual agreement

**MEMORANDUM OPINION AND ORDER**

called for a lesser disciplinary action.  While it is clear that significant policy exists to prevent the sale of adulterated or misbranded drugs to the public, Mylan's efforts in this case have failed to establish that, in the face of a CBA provision calling for less severe disciplinary action, there is a "well-defined and dominant" public policy that mandates the termination of an employee like Brooks.

Accordingly, the Court **CONCLUDES** that neither the award of Arbitrator Rimmel nor the award of Arbitrator Zobrak is subject to the public policy exception and, thus, **UPHOLDS** those awards on public policy grounds.

**b. Awards Draw Essence From CBA**

In addition to awards that violate public policy, arbitration awards that fail to draw their essence from the applicable CBA or that reflect an arbitrator's individual notions of "right and wrong" may be overturned. <u>Mountaineer Gas</u>, 76 F.3d at 608.  Indeed:

> An arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice.  He may of course look to guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective agreement.  When the arbitrator's words manifest and infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

<u>MEMORANDUM OPINION AND ORDER</u>

<u>United Steelworkers v. Enterprise</u>, 363 U.S. at 597.

When an arbitrator's award is challenged on these grounds, a reviewing court's task boils down to determining "only whether the arbitrator did his job – not whether he did it well, correctly, or reasonably, but simply whether he did it." <u>Mountaineer Gas</u>, 76 F.3d at 608 (citing <u>Remmey v. PaineWebber, Inc.</u>, 32 F.3d 143, 146 (4th Cir. 1994), *cert. denied*, 513 U.S. 1112 (1995)). In making that determination, a court examines: "(1) the arbitrator's role as defined by the CBA; (2) whether the award ignored the plain language of the CBA; and (3) whether the arbitrator's discretion in formulating the award comported with the essence of the CBA's proscribed limits." <u>Id.</u>


**(I)  Arbitrators Rimmel's and Zobrak's Roles as Defined by the Parties' CBA**

Article VI of Mylan's CBA with the Union is entitled "GRIEVANCE PROCEDURE AND ARBITRATION." (Doc. No. 7 at 7.) Section 6.1 of Article VI provides in pertinent part:

> Any grievances or disputes arising during the term of this Agreement over the interpretation or application of any term or provision set forth herein, or any claim of improper discipline or discharge shall be resolved pursuant to the grievance and arbitration procedure described in Article VI hereof.

<u>MEMORANDUM OPINION AND ORDER</u>

<u>Id.</u>  Once a grievance or dispute described in Section 6.1 reaches

arbitration through the procedures set forth in Article VI of the

CBA, as was the case here, Section 6.6 of the CBA defines the

arbitrator's role in resolving the issue presented.  Specifically:

> The jurisdiction and authority of the arbitrator shall be
> confined exclusively to the application or interpretation
> of a specified provision or provisions of the agreement
> at issue between the Union and the Employer.  This is not
> intended to limit the arbitrator's consideration of the
> entire agreement in determining the award.
>> (a)  The arbitrator shall not have the right to
>>      alter, amend, delete or add to any of the
>>      terms of this agreement.
>> (b)  The award of the arbitrator shall be written
>>      and shall be final and binding on both parties
>>      . . . .[4]

### (ii) Awards Did Not Ignore the Plain Language of the CBA

Mylan argues that both arbitration awards ignore the plain

language of the CBA, and that, under rights reserved to management

in the CBA, it promulgated a Code of Conduct through which it

further "reserves the right to impose appropriate corrective

measures in response to any action or course of conduct which

interferes with or in any way adversely affects fellow employees or

the efficient operation of its business, whether such action or

---

[4] Additional subsections of Section 6.6 of the CBA are not pertinent to
the Court's review.

<u>MEMORANDUM OPINION AND ORDER</u>

course of conduct is specifically identified as a violation or
not." (R-323).   In these two cases, Mylan asserts that Brooks'
conduct interfered with the efficient operation of its business,
and, consequently, it had the right to terminate her under its Code
of Conduct.   Accordingly, it contends that both Arbitrator Rimmel
and Arbitrator Zobrak ignored the plain language of the CBA and the
Code of Conduct when they imposed lesser disciplinary sanctions and
ordered Mylan to reinstate Brooks.

      To the extent Mylan argues that consideration of its Code of
Conduct is appropriate under the CBA, the Court agrees.

            A valid and proper policy promulgated by an employer
            pursuant to a collective bargaining agreement is
            enforceable; it need not be specifically incorporated by
            reference into the collective bargaining agreement.
            Consequently, when the collective bargaining agreement
            reserves to management the right to make and enforce
            disciplinary rules, any rules or policies promulgated in
            accordance with that authority are thus incorporated into
            the collective bargaining agreement and have the force of
            contract language.

<u>Mountaineer Gas</u>, 76 F.3d at 610.

      In this case, the CBA contains a management rights clause that
provides:

            Except as herein explicitly limited by the express terms
            of this Agreement, the employer exclusively has and
            retains all rights to manage its business and direct and
            control the working force, operations, production,
            property and means of conducting its business . . . as

MEMORANDUM OPINION AND ORDER

> long as it is not inconsistent with the provisions of
> this agreement.

Pursuant to that management rights clause, Mylan promulgated its Code of Conduct, which in turn contains the reservation of rights cited by Mylan in support of its arguments. In addition to that reservation of rights, however, Mylan's Code of Conduct outlines four levels or "Groups" of standards and the corrective actions expected to result from the violations of those standards. Further, the Code makes clear that "[c]orrective measures are not only progressively more severe between Groups I and IV, they are also progressively more severe with each recurring violation within a given group where a number of recurring violations are tolerated before final action is taken." (1:05CV35, R-144).

As noted in Section I above, both Arbitrator Rimmel and Arbitrator Zobrak evaluated Brooks' conduct against Mylan's Code of Conduct and found that her acts violated Group III and Group II standards, respectively. Moreover, given the unusual factual progression of these cases, both Arbitrators considered the conduct at issue in the cases before them to constitute first-time offenses under the Code. Each then applied a "corrective measure" outlined by Mylan's Code of Conduct as appropriate for a first-time violation of the respective Group's standards.

<u>MEMORANDUM OPINION AND ORDER</u>

To this extent, it is clear that the awards issued by both Arbitrator Rimmel and Arbitrator Zobrak drew their essence from the CBA and the Code of Conduct promulgated under it.  While Mylan generally reserved the right to take "appropriate corrective measures" in response to any conduct that affected the efficient operation of its business, its Code of Conduct specifically outlines certain corrective measures that correspond to certain "Groups" or levels of violation.  Contrary to Mylan's assertion that they ignored the language of the Code, both Arbitrator Rimmel and Arbitrator Zobrak relied on the language of Mylan's Code of Conduct in crafting their awards.

**(iii) Arbitrators Did Not Exceed Discretion Vested by the CBA**

On December 19, 2006, the Court conducted a hearing on the parties' cross-motions for summary judgment.  During that hearing Mylan refined its assertion that Arbitrator Zobrak's award failed to draw its essence from the CBA and, instead, reflected his own sense of industrial justice.  Specifically, Mylan argued that, by considering Brooks' acts of placing a piece of candy in a prescription drug bottle and writing on a prescription drug bottle a first occurrence under the Code of Conduct, Arbitrator Zobrak added to or amended the terms of the CBA in contravention of Section 6.6(a) of that agreement and, thus, exceeded the discretion

vested in him by the CBA.  It further argued that, when Brooks' act
of placing gum in a bottle is properly taken into consideration,
Brooks' two previous acts should be considered second and third
occurrences of a Level II violation.  Because the Code of Conduct
authorizes termination of an employee after a third occurrence
Group II violation, Mylan asserts that its December 10, 2004
termination of Brooks was proper under the plain language of the
CBA and Arbitrator Zobrak's award should be overturned.[5]

In his written award authorizing the reinstatement of Brooks,
Arbitrator Zobrak began the "Discussion and Findings" section as
follows:

> The circumstances cited in this case are quite unique.
> The Grievant was discharged for a second time for conduct
> that was very similar to the conduct that led to her
> first discharge.  Apparently, the Company learned of the
> circumstances that led to the second discharge of the
> Grievant during the arbitration hearing on the Grievant's
> first discharge. *Critically, the conduct that led to the
> second discharge actually occurred prior to the conduct
> that led to the first discharge*.  The Company did not
> move to discharge the Grievant for a second time until
> after it learned that she was to be returned to work
> under the terms of the first arbitration award.

(Doc. No. 9 at 9)(emphasis added).

---

[5] The Court notes that Mylan pursued this line of argument for the first
time during the December 19, 2006 hearing.  In none of the extensive briefs
filed in these cases does either party specifically address the propriety of
Arbitrator Zobrak's decision that the acts of misconduct at issue before him
constitute a first occurrence under the Code of Conduct.

<u>MEMORANDUM OPINION AND ORDER</u>

He then concluded that, "[s]ince the placement of candy in a bottle and writing on a bottle occurred before the placement of gum in a bottle, the conduct in dispute in this case must be viewed as a first occurrence." <u>Id.</u> at 9-10.

Clearly, after examining the unusual factual scenario underlying both arbitration cases, Arbitrator Zobrak made a factual determination that Brooks' acts at issue before him constituted a first occurrence violation under the terms of Mylan's CBA. In accord with long-standing labor policy, it is not for this Court to question the substance of that determination. <u>See</u> <u>e.g.</u>, <u>Eastern</u>, 531 U.S. 57, <u>United Steelworkers v. American</u>, 363 U.S. 564. Rather, the question before the Court is whether, in making that determination, Arbitrator Zobrak altered, amended, deleted or added to any terms of the parties' CBA, and, thus, went beyond the discretion vested in him by that agreement. After carful review, the Court finds that he did not.

Nowhere in the CBA itself, or in the Code of Conduct for that matter, do the parties define what constitutes an "occurrence" in relation to conduct violations and the corrective action to be taken in response to such violations. Only Section 6.7 of the CBA contains specific terms relating to Mylan's progressive disciplinary system, and it provides:

<u>MEMORANDUM OPINION AND ORDER</u>

> Reprimands issued to employees, in order to be considered
> in future disciplinary actions against an employee shall
> be in writing and a copy shall be given to the Chief
> Steward and Union President at the time of issuance.
> Reprimands shall not be used for progressive discipline
> after one year from the issuance of the reprimand.

(Doc. No. 7 at 8.)

While addressing certain procedural aspects of the system, Section 6.7 places no constraints on an arbitrator's discretion to make factual determinations regarding the timing or composition of an "occurrence" of a violation in determining an award under the CBA.

In the case of Brooks' second termination and subsequent grievance, Arbitrator Zobrak evaluated the facts against the terms of the CBA and Code of Conduct, made a determination that Brooks' acts at issue before him constituted a first-time occurrence of a Level II violation under the Code, and imposed the "corrective action to be taken in response to" such a violation as outlined by the Code. (<u>See</u> 1:05CV35, R-145.) Accordingly, the Court finds that Arbitrator Zobrak did not add to or amend the terms of the CBA, and did not exceed the discretion vested in him by the CBA when fashioning his award.[6]

---

[6] Beyond the arguments addressed *supra*, at the December 19, 2006 hearing, Mylan made no further argument with regard to Arbitrator Rimmel's discretion to fashion the award in the first arbitration proceeding.

<u>MEMORANDUM OPINION AND ORDER</u>

After examining Arbitrator Rimmel's and Arbitrator Zobrak's roles as defined by the CBA, comparing their respective awards against the plain language of the CBA, and determining whether the exercise of their discretion comported with the essence of the CBA's proscribed limits, <u>Mountaineer Gas</u>, 76 F.3d at 608, the Court **CONCLUDES** that both awards drew their "essence" from the applicable CBA.  In short, the Arbitrators "did [their] job." <u>Id.</u>  Because that is all the Court need determine, it **UPHOLDS** the awards on those grounds.

## V. <u>Attorneys' Fees to be Borne by Each Party</u>

"It has long been the general rule in the United States that a prevailing party may not ordinarily recover attorneys fees in the absence of a statute or enforceable contract providing for a fee award." <u>Shimman v. International Union of Operating Engineers, Local 18</u>, 744 F.2d 1226, 1229 (6th Cir. 1984)(*en banc*), *cert. denied*, 469 U.S. 1215 (1985).  There are exceptions to this "American Rule," however, such as when a party makes an "unjustified" challenge to an arbitration award. <u>UFCW v. Marval Poultry Company</u>, 876 F.2d 346 (4th Cir. 1989).  Here, the Union seeks the application of that exception, arguing that "Mylan's challenge of two arbitration awards in federal court is without

justification, amounting to a dilatory tactic that has led to
wasteful and unnecessary litigation." (Doc. No. 29-3 at 20.)

Under Fourth Circuit law, the appropriate standard for
determining whether a challenge to an arbitration award is
unjustified depends on the focus of that challenge. As the
appellate court stated in <u>Marval</u>:

> Where the challenge goes to the fundamental issues of
> arbitrability or of whether an arbitration award 'draws
> its essence' from the contract, the standard for
> assessing its justification is indeed the relatively
> lenient one of whether it has 'any arguable basis in law'
> . . . . Where, however, the challenge goes not to issues
> of the fundamental power of an arbitrator to make an
> award but to the merits of an arbitrator's award as made,
> the standard of justification is much more stringent.
> Indeed, because such challenges, if undeterred,
> inevitably thwart the national labor policy favoring
> arbitration, they must be considered presumptively
> unjustified.

876 F.2d at 351 (citations omitted).

As evidenced by the extensive discussion in this Opinion,
Mylan's challenges to both Arbitrator Rimmel's and Arbitrator
Zobrak's respective awards on the grounds of public policy and
abuse of the authority vested in them by the parties' CBA fall
within the lenient standard addressed in <u>Marval</u>. Moreover, under
that standard, the Court finds that Mylan's arguments at least
rested on an "arguable basis in law."

<u>MEMORANDUM OPINION AND ORDER</u>

Accordingly, in accord with the "American Rule," the Court **ORDERS** that the parties bear their own attorneys' fees in these cases.

## VI. <u>Conclusion</u>

For the reasons above, the Court **DENIES** Mylan's motions for summary judgment (1:05CV35, doc. no. 22 – 1:06CV30, doc. no. 30), **GRANTS** the Union's motions for summary judgment (1:05CV35, doc. no. 21 – 1:06CV30, doc. no. 29), and **UPHOLDS** Arbitrator Rimmel's and Arbitrator Zobrak's respective awards.  Further, given that no outstanding issues remain in these cases, they are **DISMISSED WITH PREJUDICE** from the Court's docket.

The Clerk is directed to transmit copies of this Order to counsel of record.

DATED: January 23, 2007.


                              /s/ Irene M. Keeley
                              IRENE M. KEELEY
                              UNITED STATES DISTRICT JUDGE